IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

CHARLES BRYAN FARMER,       )
                                   )
           Plaintiff,        )
                                   )
v.                              )     No. 3:05-CV-84
                                   )
TENNESSEE DEPARTMENT OF SAFETY,  )
an agency of the State of Tennessee, *et al.*,  )
                                 )
          Defendants.      )

## **MEMORANDUM OPINION**

This civil action is before the court for consideration of several motions for summary judgment. Plaintiff has brought suit pursuant to 42 U.S.C. §1983 for alleged violation of his first amendment rights of free speech and political association.[1] He alleges he was retaliated against by the defendants because he engaged in protected speech and because he did not support the winning gubernatorial candidate, whom the defendants supported. The four remaining defendants in their individual capacities, Fred Phillips, Lynn Pitts, Larry Rucker, and Charles Laxton, have each filed a motion for summary judgment [docs. 131, 141, 145, 146].[2] Plaintiff has responded [docs. 153, 178], and the defendants have filed multiple reply briefs. The court heard oral argument regarding all the motions on August 27, 2007. The motions are ripe for the court's disposition. For the reasons stated

---

[1] Plaintiff has abandoned his claims for alleged violation of his due process rights [doc. 178].

[2] The other individual capacity defendants, Dave Cooley, Carolyn Gentry, John Does, and Tom Moore, have been dismissed [docs. 211, 183, 106]. All official capacity claims have also been dismissed [doc. 34].

herein, the motions will be granted in part and denied in part.

Plaintiff was employed as a Lieutenant with the Tennessee Highway Patrol ("THP").  He alleges that the defendants,[3] Fred Phillips ("Phillips"), the Commissioner of the Department of Safety, which operates the THP; Colonel Pitts ("Pitts"); Captain Laxton ("Laxton"); and Lt. Colonel Rucker ("Rucker")  retaliated against him after he exercised his First Amendment rights of free speech and political association.  Plaintiff contends that after the Democratic governor was elected, plaintiff, a Republican, was retaliated against by Laxton with adverse job actions.  In addition, plaintiff contends that he was retaliated against by the defendants because he informed a television reporter about a THP lieutenant, Larry Parsley, who was building houses while on state time.  The disciplinary actions about which plaintiff complains are a demotion and transfer that occurred on February 5, 2004, and his termination on May 14, 2004.[4]

I.

*Summary Judgment Standard*

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to

---

[3] For clarity, the court is providing the position and rank that the each defendant held during the relevant time at issue in this case.

[4] This disciplinary action was eventually settled, and plaintiff was permitted to retire from the THP as a Lieutenant.

judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party may discharge its burden by demonstrating that the non-moving party has failed to establish an essential element of that party's case for which he or she bears the ultimate burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party need not support its motion with affidavits or other materials negating the opponent's claim. *Id.* at 323. Although the moving party has the initial burden, that burden may be discharged by a "showing" to the district court that there is an absence of evidence in support of the non-moving party's case. *Id.* at 325 (emphasis in original).

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

## II.

*Statute of Limitations*

Plaintiff filed his original complaint on February 10, 2005. Defendants argue that several of the acts plaintiff complains about are barred by the statute of limitations applicable in this case. The court agrees.

State law determines the statute of limitations for § 1983 claims because that statutory section does not contain its own limitations period. *Sharpe v. Cureton*, 319 F.3d 259, 266 (6th Cir. 2003). Tennessee has a one year statute of limitations for actions brought under federal civil rights statutes, including § 1983. *Id.* at 266 (citing Tenn. Code Ann. § 28-3-104(a)(3); *Berndt v. Tennessee*, 796 F.2d 879, 883 (6th Cir. 1986)). However, federal law determines when a civil rights action accrues. *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000) (citing *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984)). In *Hughes*, the Sixth Circuit stated the following regarding the accrual of a civil rights action:

> In *Sevier*, this court concluded as follows: The statute of limitations commences to run when the plaintiff knows or has reason to know of the injury which is the basis of his action. A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence.

*Hughes*, 215 F.3d at 548 (internal quotation marks and citation omitted).

Since plaintiff's suit was filed February 10, 2005, the § 1983 claims that arose prior to February 10, 2004, are barred by the statute of limitations. Defendants argue that plaintiff's claim regarding his demotion and transfer is barred because he received that

decision on February 5, 2004. Plaintiff did not respond to the statute of limitations arguments in his pleadings. At oral argument, his counsel mentioned that the disciplinary transfer was not effective until February 16, 2004, and that plaintiff continued to appeal the demotion and transfer decision administratively.

The effective date of the transfer is of no consequence for determining when the statute of limitations began to run. The significant event was the employment decision, the demotion and transfer, and when plaintiff gained knowledge of that decision. *Cf. Haeberle v. Univ. of Louisville*, No. CIV.A. 01-44-JBC, 2002 WL 768316, at *1 (W.D. Ky. Apr. 29, 2002) ( where plaintiff claimed his tenure application was denied for discriminatory reasons, "his cause of action accrues when the employer makes and communicates a final decision that he will not be granted tenure."). The demotion and transfer decision was conveyed in writing by defendant Phillips to plaintiff on February 5, 2004, and plaintiff received it the same day. At that point plaintiff knew or should have known of his "injury" and should have been alerted to the need to protect his rights.

In addition, the fact that he engaged in administrative appeals does not change the result. Exhausting his state administrative remedies was not a prerequisite to bringing his § 1983 claim. *Porter v. Nussle*, 534 U.S. 516, 523 (2002); *Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982). The statute of limitations was not tolled while plaintiff pursued his administrative appeals. *Cf. Haeberle*, 2002 WL 768316, at *2 (statute of limitations not tolled while plaintiff pursued university's administrative grievance procedures); *see also*

*Roberson v. Tenn.*, 399 F.3d 792 (6th Cir. 2005) (statute of limitations began to run when student denied readmission from involuntary leave of absence, not when university president issued letter supporting decision); *Kessler v. Bd. of Regents*, 738 F.2d 751 (6th Cir. 1984) (similar result where plaintiff terminated from employment). Consequently, plaintiff's claim concerning his demotion and transfer is barred by the statute of limitations.

Defendants also contend that the retaliatory acts plaintiff alleges he experienced are barred by the statute of limitations. These acts include: initiating an internal affairs investigation against him for exposing the fraudulent conduct of the THP lieutenant who was building houses on state time; giving him lower performance evaluation scores than in the past; removing him from the riot squad detail; removing him from the University of Tennessee ("UT") football detail; and placing him on the midnight shift. Defendants argue that all of these alleged acts occurred in 2003, more than one year prior to the filing of plaintiff's complaint.

The court agrees with defendants that these acts are time barred. Having occurred in 2003, these acts were outside the statutory period. The continuing violation theory does not apply to save them. In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, (2002), the Supreme Court "held that while the continuing violation doctrine applies in hostile environment Title VII discrimination actions, it does not permit recovery for discrete acts of discrimination that occurred outside the statutory period." *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003) (citing *Morgan*, 536 U.S. at 113). The Sixth

Circuit applied this reasoning to cases brought under § 1983 in *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003).

The alleged unconstitutional actions described above that occurred prior to February 10, 2004, "are discrete acts of which [plaintiff] was immediately aware when they occurred" and are therefore time barred. *Bell*, 351 F.3d at 248; *Hayes v. Automated Components Holdings*, No. 3:06-CV-00226, 2007 WL 1047650, at *4-5 (M.D. Tenn. Apr. 6, 2007) (alleged adverse employment actions were discrete acts plaintiff considered retaliation at the time they occurred and are time barred). Clearly, plaintiff considered each of these alleged actions of retaliation to be specific and discrete acts of retaliation at the time they occurred, and they occurred in 2003. Therefore, these § 1983 claims are barred by the statute of limitations.

Accordingly, the adverse action that plaintiff has remaining is his termination since there is no question concerning the timeliness of that claim. The court will base its analysis of the defendants' motions for summary judgment solely on the termination claim.

III.

*Factual Background*

After Phil Bredesen, a Democrat, became Governor of the State of Tennessee, Phillips became his Commissioner of the Department of Safety in January 2003. Phillips had supported Bredesen's campaign and was the campaign chair for Bredesen in Washington

County. Phillips appointed Pitts to Colonel in February 2003. Pitts had contributed money to Bredesen's campaign and provided security for Bredesen during the campaign at the request of Dave Cooley.[5] On February 3, 2003, Laxton was promoted by Phillips to captain from the rank of sergeant, skipping the rank of lieutenant. Laxton contributed $3,800 to Bredesen's campaign, put signs in his yard, "stood out on election day in the rain and held up signs," attended meetings, and held a fund raiser for Bredesen. Rucker contributed $5,000 to Bredesen's campaign and attended a fund-raiser.[6] In March 2003 he was promoted to

---

[5] Dave Cooley served as Deputy Governor and was a defendant in this lawsuit prior to his being dismissed by plaintiff [doc. 211].

[6] The court found the following exchange in Rucker's deposition to be of interest:

> Q.    Then why did you give him so much money?
> A.    I like Governor Bredesen and I thought he would be a good governor.
> Q.    That's why you gave him $5,000?
> A.    Yes.
> Q.    And that's why you encouraged your wife and daughter to give him 2,000?
> A.    Yes.
> Q.    Because you thought he would be a good governor?
> A.    And I – yeah, I had 30 years on the patrol at that time and I did want to move in – I was ready, worked on the road for 30 years, I was ready to do something different, I wanted to maybe do administrative work, so –
> Q.    You wanted a chance at an executive position?
> A.    Yes, that's correct.
> Q.    And you knew you would have a better chance at an executive position if you gave money?
> A    I don't know that you have a better chance but I guess you get recognized if you get involved in the campaign.
> Q.    Well, that's the way it has been for years; isn't it?
> A.    Yes, probably so.

captain and was assigned to internal affairs.[7]

Plaintiff is a Republican and donated to Republican candidates. He did not support Bredesen. Plaintiff contends that his political affiliation was common knowledge, as he stated in his deposition, "Bryan Farmer is on the football team because he has got Republican politics." During a conversation he had with Laxton in 2003 about being taken off the football detail that plaintiff taped, references were made to plaintiff being a Republican and Laxton being a Democrat and other political comments were also made. In his deposition, plaintiff was asked how he showed support for the Republican candidate for governor and his opposition to Bredesen. He responded, "Bumper stickers and a yard sign." However, the next day when he testified he did not recall the testimony regarding the bumper stickers and yard signs. He stated, "I may have had one on my wife's car, but I don't like those things on my car personally."

On February 4, 2004, plaintiff attended a due process hearing in Nashville to address the allegations that plaintiff had worked secondary employment while on sick leave and that there were discrepancies in his time records. Laxton, Rucker, and Pitts attended the

---

[7] Although it did not weigh in the court's consideration of the issues under review, the court is aware of the pervasive political atmosphere existing at the THP that received public attention [doc. 58]. The Governor indicated that his goal was to remove politics from the THP, and he ordered a review of THP management procedures. Not long after the events involving plaintiff occurred, the THP underwent internal changes. Pitts was requested by Phillips to resign his position in early December 2005. Also in December 2005, Phillips resigned as Commissioner of the Department of Safety. In May 2006, Laxton was demoted and reassigned to Cookeville. At some point subsequent to that personnel action, Laxton asked for his campaign contribution back. Rucker was also demoted and reassigned to Washington County. He too asked for his campaign contribution to be returned.

hearing.  At that hearing, the plaintiff made the following statement:

> The only thing I would like to say and it's not going to be a welcomed statement, but I think that uh, I have been singled out in this matter and for two reasons.  One reason being political reason and second reason being that uh, I have been perceived as being the one to leak the word to the Media up there that Lieutenant Parsley was doing his wrong doing.  I feel like I have to say that, but I apologize if it ruffles anybody's feathers or hurts any feelings but I am firmly convinced myself that's the reason for this.

At the close of the meeting, plaintiff asked for time cards and attendance sheets for the entire district.  He asked for the opportunity to sit down in the office and look at them or take them home.  It was agreed that the records should not leave the office.  There is nothing further on the transcript regarding how plaintiff was to review the time records.  According to defendants, after the audio tape ran out at the hearing, Pitts told plaintiff that if he wanted to see the time cards for other troopers assigned to the Knoxville district he needed to come during business hours and have a supervisor with him while he inspected the cards.  Three attendees at the meeting have initialed memoranda to that effect.

In addition, Laxton contends that he spoke with plaintiff by Nextel two-way radio while plaintiff was returning to Knoxville after the hearing and told him that he needed to fill out request for inspection forms for everyone whose file he wanted to see.  Laxton contends that he told plaintiff he would be monitored by a supervisor while viewing the files and that no files were to leave the building.  However, plaintiff denies these contentions. He denies talking with Laxton on his return to Knoxville and that he was told he would need to

view the files with a supervisor.

On February 10, 2004, plaintiff went to the THP office in Knoxville after business hours. The only person present was the dispatcher, Carolyn Gentry ("Gentry"). She has stated that plaintiff entered the control room and "walked around the back of the console and took two or three stacks of time cards." Gentry contends plaintiff left the radio room with the cards and later returned, presumably with the cards, and went back behind the console again. Gentry also stated, "Lieutenant Farmer, as he was leaving, said to me, you did not see me here."

Plaintiff denies Gentry's version of the events. He testified that he went to the office that night to drop off his weekly reports. He put the reports under Laxton's door or in the sergeant's office. He recalled going to the radio room and speaking with the dispatcher (Gentry) and looking at the work schedules. The two chatted about her child who had some sort of illness or injury. He categorically denies taking time sheets or making the remark to Gentry about his not being there.

Within ten or fifteen minutes of plaintiff's departure, Gentry contacted Laxton and reported the incident. Gentry memorialized the event in a very short memorandum she sent to Laxton. Laxton contacted Pitts, and a second investigation was initiated against plaintiff, which was conducted by Laxton and Rucker of Internal Affairs. On May 5, 2004, Pitts sent a memorandum to plaintiff informing him of the results of the investigation and his decision to recommend to Phillips that plaintiff be terminated from his employment. The

11

memo indicates that Laxton recommended termination to Pitts. A level III due process hearing was set for May 13, 2004.

The level III hearing occurred on May 13, 2004, and on May 14, 2004, Phillips upheld the decision to terminate plaintiff. A level IV hearing was held on July 24, 2004, and on August 5, 2004, the hearing officer recommended termination. Phillips upheld the decision on August 6, 2004. Before the level V hearing occurred, a settlement was reached, and plaintiff retired from the THP as a lieutenant.

## IV.

*Individual Motions for Summary Judgment*

### A. Qualified Immunity

All four defendants have moved for summary judgment based on qualified immunity. Under the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "This immunity shields officials 'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Perez v. Oakland County*, 466 F.3d 416, 426 (6th Cir. 2006) (quoting *Myers v. Potter*, 422 F.3d 347, 352 (6th Cir. 2005)). Plaintiff has the burden of demonstrating that defendants are not entitled to qualified

immunity. *See v. City of Elyria*, 502 F.3d 484, 491 (6ᵗʰ Cir. 2007) (citing *Wegener v. City of Covington*, 933 F.2d 390, 392 (6ᵗʰ Cir. 1991)).

In evaluating whether an official or officer is entitled to qualified immunity, the court undertakes a two-part analysis: "(1) whether, considering the allegations in the light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Elyria*, 502 F.3d at 491 (quoting *Swiecicki v. Delgado*, 463 F.3d 489, 497-498 (6ᵗʰ Cir. 2006). "The focus of the inquiry is not whether the claimed constitutional right was established on a general level, but whether on the specific facts of the case reasonable officials could disagree on whether the particular conduct under scrutiny violated the Constitution." *Gratsch v. Hamilton County*, 12 F. App'x 193, 202 (6ᵗʰ Cir. 2001) (citing *Anderson v. Creighton,* 483 U.S. 635, 640-41 (1997)).

Plaintiff contends that the actions that were initiated and that ultimately led to his dismissal were in retaliation for his exercising his First Amendment rights of free speech and political affiliation.

> In order to establish retaliation for engaging in constitutionally protected activity, a plaintiff must prove the following elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two - that is, the adverse action was motivated at least in part by the plaintiff's protected conduct."

*Sowards v. Loudon County,* 203 F.3d 426, 431 (6ᵗʰ Cir. 2000) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6ᵗʰ Cir. 1999)).

## 1. First Amendment Speech

The court will initially address the First Amendment speech claim in the context of qualified immunity. The defendants are all situated differently as to their level of knowledge regarding plaintiff's speech concerning the TV reporter. Therefore, the defendants will be discussed separately.

## Charles Laxton

The qualified immunity inquiry begins with a determination of whether a constitutional right has been violated. With regard to his First Amendment speech claim, as a public employee, plaintiff must first show that his speech is protected. *Elyria*, 502 F.3d at 492 (citing *Connick v. Myers*, 461 U.S. 138, 147 (1983)). "To accomplish this, the employee must show that his speech touches on a matter of public concern." *Elyria,* 502 F.3d at 492. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at147-48. The Sixth Circuit has stated that "[a] matter of public concern usually involves a matter of political, social, or other concern to the community." *Jackson v. City of Columbus*, 194 F.3d 737, 746 (6th Cir. 1999) (abrogated on other grounds). The speech at issue is plaintiff's informing the TV reporter that Lieutenant Parsley was building houses for his construction business while on state time.

While defendants argue that plaintiff's statements to the TV reporter were not a matter of public concern, the court believes otherwise. The Sixth Circuit has held that misuse of public money and public corruption are matters of public concern. *See Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986) ("Public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law and seeing that public funds are not purloined."); *Chappel v. Montgomery County Fire Prot. Dist. No. 1*, 131 F.3d 564, 576 (6th Cir. 1997) (following *Marohnic*); *Solomon v. Royal Oak Twp.*, 842 F.2d 862, 865 (6th Cir. 1988) (disclosure of public corruption deserving of constitutional protection); *Wilkins v. Jakeway*, No. 94-4137, 1996 WL 84649, at *5 (6th Cir. Feb. 27, 1996) ("[T]he misuse of public money is certainly a matter of public concern.").

Defendants argue that plaintiff's motive for leaking the information about Parsley was in retaliation for his being taken off the UT football detail. While the timing and circumstances could lead to that conclusion, plaintiff's motive for engaging in the speech is not dispositive. *Farhat v. Jopke,* 370 F.3d 580, 590-92 (6th Cir. 2004). Even if the plaintiff spoke out of personal animus, the pertinent inquiry is what he said and whether it touches a matter of public concern, not what his motive was in doing so. *Id.*

The court concludes that when plaintiff spoke to the TV reporter about the activities of Lieutenant Parsley he was speaking about a matter of public concern. Lieutenant Parsley was supposed to be on duty with the THP but was out building houses for his personal construction company. Therefore, he was a public servant arguably engaged in a

fraud upon the state and the misuse of public funds. Such conduct is a matter of public concern.

However, the factual twist in this case is that at the time plaintiff gave the reporter the information about Parsley, he did not tell anyone except his wife that he had done so. Laxton testified in deposition that he suspected plaintiff had been the source of the story and that he had leaked the information in retaliation for being taken off of the UT football detail. At his due process hearing on February 4, 2004, plaintiff stated that he was being singled out for political reasons and because he was perceived as the person who leaked to the media the story about Parsley. Laxton attended that hearing. Therefore, at that point in time, Laxton was put on notice that plaintiff was claiming that he was being singled out as the source of the Parsley story. This fact, along with Laxton's existing suspicion that plaintiff was indeed the source of the story, create a genuine issue of material fact concerning whether Laxton had sufficient knowledge of plaintiff's First Amendment speech to retaliate against him for the exercise of that right.

Having determined that plaintiff's speech comprised a matter of public concern, the court must consider whether his First Amendment interests "outweigh the defendants' interest as an employer 'in promoting the efficiency of the public services it performs through its employees.'" *Elyria*, 502 F.3d at 492 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). The Sixth Circuit has analyzed several factors when attempting to strike a balance in this context, including whether the speech:

> related to an issue of public interest and concern; was likely to
> foment controversy and disruption; impeded the department's
> general performance and operation; affected loyalty and
> confidence necessary to the department's proper functioning;
> subverted department discipline; was false and the employer
> could not have easily rebutted or corrected the errors; and was
> directed toward a person whom the speaker normally contacted
> within the course of daily work.

*Elyria*, 502 F.3d at 493 (quoting *Solomon v. Royal Oak Twp.*, 842 F.2d 862, 865 (6th Cir. 1988) (citing *Pickering*, 391 U.S. at 569-73)).

Laxton argues that the application of the relevant factors weigh in favor of the defendants. However, there has been no showing in the record that plaintiff's speech "interfered with the employee's duties, created discord among the staff, undermined discipline, or impaired the trust and loyalty required of confidential employees." *Wilkins v. Jakeway*, No. 94-4137, 1996 WL 84649, at *5 (6th Cir. Feb. 27, 1996); *cf. Elyria*, 502 F.3d at 493 (no evidence that plaintiff's complaints "actually impeded the police department's general performance and operation or affected loyalty and confidence necessary to the department's proper functioning"). "In assessing whether certain speech should be protected under the balancing test of Pickering and its progeny, the focus is on the disruption resulting from the speech itself, not other events." *Williams v. Commonwealth of Ky.*, 24 F.3d 1526, 1536 (6th Cir. 1994) (citing *Solomon v. Royal Oak Twp.*, 842 F.2d 862, 866 (6th Cir. 1988)). Parsley was quickly investigated, and he eventually retired, paying the state back the wages for the day he was caught not working. The revelation about his conduct obviously created a certain amount of turmoil for the THP. However, "when an employee exposes

unscrupulous behavior in the workplace, his interests are co-extensive with those of his employer; both want the organization to function in a proper manner." *Marohnic*, 800 F.2d at 616. After considering the appropriate factors, the court believes that plaintiff's First Amendment rights outweigh any harm to the efficiency of the THP.

Notwithstanding that conclusion, material issues of fact again exist because of Laxton's knowledge or lack thereof that plaintiff was the source of the media leak regarding Parsley. Therefore, material issues of fact exist regarding the balancing test and whether plaintiff's speech is constitutionally protected as a matter of public concern that outweighs THP's interests.

The second prong of a retaliation claim is an adverse action. Plaintiff was terminated. There appears to be no dispute regarding that element. The third element requires a showing of a causal connection between the adverse action and the speech, or "whether the speech was a substantial or motivating factor in the employer's decision to discipline or dismiss." *Elyria*, 502 F3d at 492.

Plaintiff denies that he took the time cards as alleged by Gentry and denies that he made the comment she alleges he made, "You never saw me here." This was the conduct reported to Laxton by Gentry that began the investigation that ultimately resulted in plaintiff's termination. If it did not occur, then arguably there was no basis to investigate plaintiff and terminate him. Plaintiff contends that the investigation was instigated because he was the source of the Parsley story. Clearly, there is a material issue of fact concerning

the events that set in motion plaintiff's termination.

The court concludes that plaintiff has alleged sufficient conduct involving Laxton that if shown to be true would be a violation of his well-established First Amendment rights. In the context of qualified immunity, the court must consider whether the right was so clearly established that in the situation of this case Laxton's actions were objectively unreasonable.

At the time plaintiff was terminated, a public employee's right to speak on matters of public concern without being subject to improper government retaliation was settled. *Id*. at 495 (citing *Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir. 1994) ("The law is well settled in this Circuit that retaliation under color of law for the exercise of First Amendment rights is unconstitutional, and 'retaliation claims' have been asserted in various factual scenarios."); *Chappel v. Montgomery County Fire Prot. Dist. No. 1*, 131 F.3d 564, 580 (6th Cir. 1997) ("All public officials have been charged with knowing that public employees may not be disciplined for engaging in speech on matters of public concern. . . .")). However, the legal issue of whether Laxton is entitled to qualified immunity is dependent upon which version of the facts is accepted. *See Sova v. City of Mount Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998).

The central facts that set in motion plaintiff's termination are in dispute, i.e., whether plaintiff took and did anything with the time cards on the night of February 10, 2004, and whether he told Gentry, "You haven't seen me here." Resolution of the dispute depends

upon whether Gentry is to be believed and plaintiff therefore violated a department order or whether plaintiff is to be believed and he was set up in retaliation for being the source of the Parsley story. Therefore, Laxton is not entitled to qualified immunity on plaintiff's §1983 claim based on protected speech.

<u>Fred Phillips</u>

The court applies the same analysis set out above to decide the issue of whether Phillips is entitled to qualified immunity on plaintiff's First Amendment speech claim. As with Laxton, there is a material question of fact concerning Phillips's knowledge about whether plaintiff was the source of the Parsley story. In his very specific affidavit, Phillips states, "No part of my decision to terminate Mr. Farmer's employment was based upon . . . any knowledge or suspicion I may have had that Mr. Farmer had been the source of the media reports concerning Lieutenant Parsley." In the February 5, 2004 memorandum to plaintiff affirming recommendation to demote and transfer plaintiff, Phillips indicates that he carefully considered "all the information and facts presented at the Level III Due Process Hearing and the recommendation from Colonel Lynn Pitts." The due process hearing was held on February 4, 2004, and it was at that hearing when plaintiff made his position clear that he was being singled out for political reasons and because he was perceived as the source of the Parsley story. Phillips was therefore on notice along with Laxton what plaintiff was claiming regarding the disciplinary actions being taken against him. The court believes that

there is a material issue of fact regarding Phillips's level of knowledge as to plaintiff's First Amendment speech, so there is an issue of fact whether he could have retaliated against him based on that speech.

As established above, at the time plaintiff was terminated, his right as a public employee to speak on matters of public concern without retaliation was settled. The court looks to whether Phillips's actions were objectively unreasonable. However, qualified immunity must be denied because as with Laxton the legal issue is dependent on which version of the facts is accepted. The central facts regarding the night of February 10, 2004, and what plaintiff did or did not do on his visit to THP headquarters are contested. Phillips's termination decision is based on the investigation stemming from those events. Therefore, Phillips is not entitled to qualified immunity on plaintiff's First Amendment speech claim.


<u>Lynn Pitts</u>

With regard to Pitts, the court also finds that questions of fact preclude qualified immunity. Pitts states in his declaration, "I was not aware, until I read the Complaint filed in this lawsuit, that Mr. Farmer was the source of the WVLT News story regarding Mr. Larry Parsley's involvement with a construction business while on duty with the THP." However, Pitts was the hearing officer at the February 4, 2004 due process hearing when plaintiff made it clear that he felt he was singled out for being perceived as the source of the Parsley story. Thus, while Pitts may not have had full confirmation that

plaintiff was the source of the story until the complaint was filed, he was on notice of what plaintiff was claiming as of February 4, 2004. That at least raises a question of fact regarding the sufficiency of his knowledge about plaintiff's speech and whether Pitts could have retaliated against plaintiff based on that speech.

With regard to Pitts' role in the termination, he issued a detailed memorandum dated May 5, 2004, to Farmer recommending plaintiff's termination that was based on the facts of the investigation stemming from the events of plaintiff's visit to THP headquarters on February 10, 2004. As already discussed, those events are greatly contested. Therefore, Pitts is not entitled to qualified immunity as to plaintiff's First Amendment speech claim.

## Larry Rucker

Like Laxton and Pitts, Rucker was present at the February 4, 2004 due process hearing and would have been put on notice at that time that plaintiff believed he was being singled out for being the perceived source of the Parsley story. As with the other defendants, that circumstance raises a question of fact regarding the sufficiency of Rucker's knowledge about plaintiff's speech and whether Rucker could have retaliated against plaintiff based on his speech.

Although Rucker, as part of Internal Affairs, maintains that he could not recommend that plaintiff be terminated, his role involved the investigation, or lack thereof, that was conducted and ultimately led to plaintiff's termination. As already noted, the facts

surrounding plaintiff's visit to the THP office on February 10, 2004, are in dispute. The court also believes that there are material issues in dispute concerning the investigation that followed the events of that evening. Plaintiff was notified on May 5, 2004, that based on the results of the investigation of Laxton and Internal Affairs, Pitts was going to recommend to Phillips that plaintiff be terminated. However, Rucker did not personally interview Gentry until June 10, 2004. In his deposition, Rucker was asked, "Why – why did you wait several months later before she was questioned?" He responded, "I had a memo regarding her statement and basically wasn't in no hurry to interview her. I had a memo." Rucker was also asked in deposition about whether any time cards were missing. He responded, "I didn't do an investigation as far as time cards accountability after that memo was submitted. I may have asked Captain Laxton if any was missing. I probably did. I don't recall. I am – I don't recall any being missing."

Again, as with the other defendants, whether Rucker is entitled to qualified immunity depends upon which version of the facts is accepted. A jury could infer from Rucker's testimony stated above that a thorough investigation into Gentry's contentions was not made by Internal Affairs. However, Rucker's conduct cannot be completely separated from the factual dispute that exists concerning the events at the THP office. If plaintiff's version is accepted, then arguably the investigation conducted by Rucker was not proper and was part of the alleged retaliation waged against plaintiff for leaking the Parsley story. Thus, the court concludes that Rucker is not entitled to qualified immunity on plaintiff's claim for

protected speech.

## 2. Political Affiliation Claim

Plaintiff also contends that he was retaliated against by being terminated based upon his First Amendment right of political association. Plaintiff must demonstrate the same elements as set forth above for his First Amendment retaliation protected speech claim. *Sowards v. Loudon County,* 203 F.3d. 426, 431 (6th Cir. 2000).

Again, the qualified immunity analysis begins with a determination of whether a constitutional violation has occurred. Plaintiff must first demonstrate that he engaged in protected conduct. "The right of political association is a well established right under the First Amendment for political belief and association constitute the core of those activities protected by the First Amendment. Support of a political candidate falls within the scope of the right of political association." *Id*. at 432 (quotation marks and citations omitted).

The court believes that there is at least a question of fact as to whether plaintiff engaged in protected conduct regarding political association. There is evidence in the record that all the defendants had knowledge of plaintiff's political affiliation and that it differed from theirs and that of the current gubernatorial administration. Laxton clearly knew plaintiff was a Republican as evidenced from the transcript of the meeting between them. Rucker and Pitts attended the due process hearing where plaintiff made his position clear that he was being targeted for political reasons. Phillips considered "all the information and

facts" presented at that hearing. At a minimum, there is a question of fact concerning whether plaintiff engaged in protected activity by supporting a political candidate or being singled out for being a member of the opposing political party.

There is no issue regarding an adverse action as plaintiff was terminated. With regard to the causal connection between the adverse action and the protected activity, plaintiff needs to show that the adverse action was at least motivated in part by his protected activity. *Elyria,* 502 F3d. at 492. As discussed in relation to plaintiff's protected speech claim, the material facts surrounding the circumstances that initiated plaintiff's termination are at issue as to all of the defendants. Therefore, the court concludes that regarding all the defendants, plaintiff has shown sufficient conduct that if true, the defendants would have violated plaintiff's well-established First Amendment right of political association. In the context of qualified immunity, the court must consider whether the right was so clearly established in the situation of this case that the defendants' actions were objectively unreasonable.

When plaintiff was terminated, the rights of political association and support of a political candidate were well established as was the right not to be retaliated against for exercising those rights. *Sowards*, 203 F.3d 426. As already herein developed with the free speech claim, the central facts at issue regarding plaintiff's termination are at issue. Resolution of the dispute depends upon which version of the facts is believed. This is true for all the defendants. Therefore, it is not appropriate to grant qualified immunity to the

defendants as to plaintiff's political association claim.

## B. The Merits of Plaintiff's First Amendment Claims

With regard to the merits of plaintiff's claims, the court believes that the summary judgment motions should be denied. As set forth above, for both of the First Amendment claims, plaintiff must establish specific elements. The court has already found that there are material issues of fact as to certain of those elements that preclude summary judgment and require a trial on the merits. However, the court notes at this point that once the plaintiff establishes the required elements for a retaliation case, defendants may demonstrate "that it would have taken the same action even in the absence of the protected conduct." *Jackson v. Leighton*, 168 F.3d 903, 909 (6th Cir. 1999). To the extent defendants argue that this is what happened in this case, the court finds there are material issues of fact. The circumstances that triggered the events that ultimately led to plaintiff's termination are highly contested. To find that the defendants would have taken the same action absent the protected conduct would require the court to determine the motivation and credibility of the actors involved, conduct which is beyond the court's role at summary judgment. Therefore, the court concludes that all of the defendants' motions for summary judgment must be denied to the extent they seek dismissal of the plaintiff's claims on the merits.

### C. Punitive Damages

Laxton argues for summary judgment on the issue of punitive damages. However, the court finds that it would be premature to decide the issue of punitive damages at this time. Therefore, Laxton's motion will be denied as to that claim. Nevertheless, the parties are not precluded from seeking dismissal of the punitive damages claim at the appropriate time at trial.

Accordingly, for the reasons set forth above, defendants' motions for summary judgment will be granted in part and denied in part. An order consistent with this opinion will be entered.

ENTER:

_____s/ Leon Jordan_____
United States District Judge